JAMES EDWARD WARD *v.* STATE OF MARYLAND

[No. 340, September Term, 1975.]

*Decided January 29, 1976.*

114

The cause was argued before ORTH, C. J., and MENCHINE and MASON, JJ.

*Joseph S. Casula, Assigned Public Defender,* with whom was *Edward P. Camus, District Public Defender* on the brief, for appellant.

*Michael James Kelly, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *E. Garrison Neal, Assistant State's Attorney for Prince George's County* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

At about 1 a.m. on April 28, 1972, Dorothy Mae Ward, estranged wife of the appellant, and one Gerry Godbout were seated in the automobile of the latter, parked outside the wife's apartment. A gunman approached the passenger side of the vehicle and fired five times into the vehicle. Godbout was killed; the estranged wife was not hit. The gunman ran from the scene toward a vehicle that simultaneously had pulled out of the parking lot. The latter vehicle stopped, the gunman entered, and it departed the crime scene at high speed — but not before a witness had noted its description and tag number. He telephoned police. A prompt radio alert caused police within minutes to stop an automobile operated by David Victor Maness with Harry Edward Brockman a passenger. Both were placed under arrest. At appellant's trial Brockman was identified as the gunman; Maness as the driver of the escape vehicle.

James Edward Ward was convicted by a jury in the Circuit Court for Prince George's County for conspiracy to murder; accessory before the fact of murder and attempted murder. He was sentenced to life imprisonment.

On appeal he asks:

"1. Was the Appellant convicted on the basis of evidence obtained by an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution?

2. Did the Lower Court commit reversible error in admitting into evidence an incriminating statement of the Appellant without a proper hearing as to its inducement?

3. Was the out-of-Court identification so impermissively suggestive and unfair as to create

a substantial likelihood of irreparable mis-identification so as to constitute a denial of due process of law?

4. Did the unreasonable and unjustified prosecutorial delay violate the right of the Appellant to a speedy trial under the Sixth Amendment to the United States Constitution?

5. Was there sufficient evidence produced at the trial to sustain the convictions?

## 1. *Search and Seizure*

Appellant's complaint that items unlawfully seized were admitted in evidence against him at trial is without record support. The State concedes that a search of appellant's home on April 28, 1972 was constitutionally infirm. It is quite clear from the record, however, that all items seized therein were returned to the appellant by court order. None was either offered or received in evidence at the trial. In a secondary complaint appellant contends that other tangible evidence offered and admitted in evidence constituted "fruits of the poisonous tree." This complaint relates to: (1) a cassette tape "with voices discussing the items taken during the illegal search and seizure"; (2) "a letter [Exhibit 5] found subsequent to the initial search"; and (3) "a note [Exhibit 6] found during a search of Mr. Maness's car (an alleged co-conspirator)." We find no taint stemming from the unlawful seizure attaching to those items.

## *The Cassette Tape*

The cassette tape was found by the appellant's daughter in August, 1974 and thereafter was delivered by the wife to police authorities. The record shows not the slightest evidence of State complicity in the seizure of the item. It was properly admitted in evidence. *Coolidge v. New Hampshire,* 403 U. S. 443, 487, 91 S. Ct. 2022, 2048, 29 L.Ed.2d 564, 595 (1971). In *Herbert v. State,* 10 Md. App. 279, 284-85, 269 A. 2d 430, 432-33 (1970), we said:

"Whatever wrong is done by the act of one

individual in taking the property of another, it is no invasion of the security afforded by the Fourth Amendment against unreasonable searches and seizures. *Burdeau v. McDowell, supra,* at 475. When an individual obtains incriminatory matter from an accused, no matter how improperly, and such matter comes into the possession of the government without a violation of the accused's rights by governmental authority, the exclusionary rule does not prohibit its use at trial." (Footnote omitted)

## The Letter and the Note

The letter, contrary to appellant's claim, was in the possession of police months before the unlawful search of appellant's premises. It had been addressed to the Chairman of the Prince George's County Human Relations Committee and bore the signature of the appellant. The typed letter consisted of a diatribe against the Committee for an attack by it upon the Prince George's County Police Department. The letter ended as follows, "Why don't you lousey BASTARDS doues [sic] yourselves with gasoline. I will gladly apply the match."

The note, also typewritten, was found during the course of a lawful search of the Maness vehicle. That search occurred prior to the unlawful search of appellant's home and had no connection therewith. This note contained a description of the wife of the appellant; designated the location of her place of employment; listed the hours of her arrival at and her departure from the place of employment; and set forth the make, tag number and ownership [1] of an automobile that might be used to transport her from work to her home. The note also gave the address and location of the apartment occupied by appellant's wife. When the State offered the testimony of an expert FBI witness, an objection was interposed.

---

1. The note described the owner as "Godbout, Jr." The victim of the murder was Gerry Godbout.

118

At that point the trial court and counsel at a bench conference discussed the intended purpose of the witness's testimony and limitations to be imposed upon it. The following extracts from the record suffice to show the full tenor of the objection; the nature of an inquiry conducted out of the presence of the jury; and the ultimate opinion of the witness before the jury:

"MR. DAWSON: Your Honor, the reason I said before, this gentleman has the typewriter. The typewriter was taken from Mr. Ward's home, which was suppressed, was used in trying to identify these two letters. That is the reason for my objection. This is doing indirectly what they could not do directly.

MR. NEAL: Your Honor, the two letters were presented to this man for comparison and the two letters were compared, Your Honor. We will not bring out any testimony concerning the typewriter.

THE COURT: The typewriter was not presented.

MR. NEAL: Your Honor, the typewriter was presented to him at one time, but the typewriter was checked out against the letters, but we will elicit no testimony from an item which has been seized. The only thing we are asking for is a letter which came to the police department from an independent source and a letter which was found in Mr Maness' car.

Now, he was asked to compare these two letters, and it is only that testimony —

THE COURT:     But you are not referring to any knowledge he gained by virtue of examining the typewriter?

MR. NEAL:     No, Your Honor. The only thing we are bringing into it is two questioned documents, no typewriter whatsoever.

MR. DAWSON:     But Your Honor, he used the typewriter to check out whether or not these letters could have been typed on the same typewriter. That typewriter was suppressed in 1972.

THE COURT:     But he is not going to use anything in regard to the typewriter.

MR. DAWSON:     He is using it indirectly.

THE COURT:     He cannot use it in any way. He is only using it in comparison of those two letters, without regard to the typewriter.

MR. DAWSON:     But he had the typewriter and used it in comparison.

THE COURT:     He does not have to develop everything that the man might know. His proffer is that he is only going to use what the man gained from looking at these two letters, without regard to any examination of the typewriter. Now that is his proffer, is it not?

MR. NEAL:     That's correct, Your Honor.

THE COURT:     I am going to hold him to that. For that reason it does not even go into the unlawful search and seizure. It is just like he had never seen the typewriter.

MR. DAWSON: Your Honor, when he took that typewriter in, incorporated evidence in regard to this evidence from the typewriter —

THE COURT: He says he did not.

MR. DAWSON: Could we ask the gentleman out of the hearing of the jury?

* * *

THE COURT: I intend to do that.

* * *

THE COURT: If you gave us here an opinion today though to the jury, it would not be based on any examination of anything you have done with any typewriter that has been suppressed in this case?

THE WITNESS: That's correct.

* * *

Q Did the fact that you had the — physically had the typewriter add to or detract in any way the comparison of State's Exhibits 5 and 6, the two letters?

A It does not. The comparisons of State's Exhibits 5 and 6 compared item for item, the typewriting on 6 with the typewriting on 5 I made independently of the typewriter, and it had no bearing on my conclusion relative to that comparison.

* * *

THE COURT: But solely from a comparison of the characteristics of the letters used in both of those letters?

THE WITNESS: That is correct.

THE COURT:    Under that basis I will let it in.

MR. DAWSON:   Objection.

THE COURT:    Overrule.

Return the jury.

Q  Mr. Shaneyfelt, could you step down here and by the use of these two charts that you photographed explain to the ladies and gentlemen of the jury what you found and what your conclusion was?

A  Yes, I would. Now, State's Exhibit 44, on the right as you are looking at it is an enlargement of the typewriting appearing on State's Exhibit 6. The typewriting on State's Exhibit 45, which is on your left as you see it, is the top portion down to that top portion of State's Exhibit 5.

In making this comparison of the typewriting that I mention I make the letter formations that this is a rare — this is a script type of type, that are not awfully common, in too common a use that has the script type letters, the formation like this.

I find those same letter formations in both specimens. The 'm's' and 'w's' in comparing them, 'W' in Washington, not always the same letter appears, but a sufficient number appears as — and the 'p's', I find in both specimens to be the same. The 'g' is like a written 'g' or a script 'g'. You find those 'g's' in midnight. These, I found all of the same characteristics in both State's Exhibit 6 and State's Exhibit 7. The type style is the same. There is no variances.

I then looked for broken letters and the things of a more individual nature and I find that there is very little difference in alignment. One of the things I look for is a letter printing too

high or too low or to the right or to the left of a bent letter. I find that the typewriter does not have any misalignment to speak of, anything that is significant enough to arrive at any decision.

The manner in which letters attach together, where the 't' attaches to the 'i', whether or not it just about hits or doesn't quite hit as it connects there, I find that they are all within normal limits. I find no significant differences that would let me say that this typewriter is different from that one.

At the same time, I find everything similar. I find everything — alignment is the same and in making comparisons of typewriting, if I have two specimens that develop to be different I do find these differences in alignment, and in this instance I find no differences in alignment. These are right along the line. There are no variations that are present here that are not present over here. Everything lines up very much the same.

In addition, the 'o's', I find tend to type a little bit of design of the ribbon texture in the State's Exhibit 6 and I find that same characteristic in 'o's' and 'a's' in the center of the 'a's' on there, indicating about the same pressure of typewriting.

While I found no differences and not enough individuality to permit positive identification it was my conclusion that State's Exhibit 5 and State's Exhibit 6 could have been typed on the same typewriter.

Q  Were there any differences at all?

A  I found no differences at all, no differences at all."

We think it is quite plain that the questioned documents

were not derived from the unlawful search and were not "fruits of a poisonous tree." We find that the circumstance that the witness had once possessed the illegally seized typewriter and had conducted other tests upon it, did not prevent him from expressing the opinion that the two exhibits were products of the same mechanical device.

The answer to appellant's first question is: No, he was not convicted on the basis of evidence obtained by unlawful search and seizure.

## 2. *The Appellant's Statement*

The co-conspirator Maness, in the course of discussions relating to plea bargaining at his trial for the murder, agreed to testify as to appellant's complicity in the killing. On July 9, 1974 Maness gave a deposition that implicated Ward as the person who had initiated a contract to have Brockman murder Mrs. Ward.[2] On July 10, 1974 a warrant was issued for the appellant, and he was arrested at the place of his employment. He was taken forthwith to police headquarters where he was made aware of the full panoply of *Miranda* rights. He waived his *Miranda* rights and agreed to interrogation by police.

When the State manifested an intention to offer the written statement in evidence the trial court dismissed the jury and conducted a suppression hearing out of their presence. *Barhart v. State,* 5 Md. App. 222, 246 A. 2d 280 (1968). In the course of that hearing it was made crystal clear that the State was not proposing to offer in evidence any statement other than that which had been made on July 10, 1974. At the conclusion of the suppression hearing, the court found that the statement was "voluntarily entered into, intelligently, knowingly, understandingly." It subsequently was admitted in evidence.

In a second string to his bow, appellant further contends that the statement was a "fruit of the poisonous tree," citing

---

2. The intended victim was unharmed. Her male companion was killed in the attempt to kill her. By transferred intent that killing was murder. Gladden v. State, 20 Md. App. 492, 316 A. 2d 319 (1974).

*Wong Sun v. U. S.*, 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963), and *Everhart v. State*, 274 Md. 459, 337 A. 2d 100 (1975). Those cases clearly do not bar the use of the subject statement. The previously described letter and note constituted the only tangible evidence shown to him on that date during the course of his interrogation. We have heretofore pointed out that those documents were in no way connected with the search and seizure of April 28, 1972. Thus, there is no record support for appellant's contention that he was confronted with the fruits of that unlawful search and seizure. The arrest, interrogation and statement of the appellant on July 10, 1974 were products solely of information gained from the co-conspirator Maness on the previous day. The statement of July 10, 1974 is in no sense a product of primary illegality. Rather, it falls within the exception outlined in *Wong Sun, supra,* at 487-88 [417] [455]:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently dis-tinguishable to be purged for the primary taint.' Maguire, Evidence of Guilt, 221 (1959)."

The statement of July 10, 1974 was properly admitted in evidence.

### 3. *Identification*

When it became apparent that the State would seek an in-court identification of the appellant by the witness Maness, an objection was interposed. In accordance with procedures approved in *Smith & Samuels v. State*, 6 Md. App. 59, 250 A. 2d 285 (1969), cert. den. 397 U. S. 1057 (1970), the trial judge suspended proceedings before the jury and conducted a hearing out of their presence. At its conclusion the trial judge declared that he would permit the

identification testimony. The jury was then recalled and the witness Maness without objection made an in-court identification. He also testified, again without objection, that he previously had identified photographs of the accused. The identification issue was waived. *Jones v. State,* 9 Md. App. 455, 457, 265 A. 2d 271, 272-73 (1970), cert. den. 400 U. S. 906 (1970).

### 4. *Speedy Trial*

In depth consideration of speedy trial decisions of the Supreme Court of the United States; of the Court of Appeals of Maryland; and of this Court was undertaken by the Court of Appeals in the case of *Epps v. State,* 276 Md. 96, 345 A. 2d 62 (1975). Judge O'Donnell, for the Court, summarized the holding in *Barker v. Wingo,* 407 U. S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972), saying at 104 [68-69] of *Epps:*

> "In 1972, the Supreme Court, in *Barker v. Wingo,* 407 U.S. 514 (1972), pointed out that '[t]he right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused' and that '[i]n addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to the interest of the accused.' It then postulated that 'the right to [a] speedy trial is a more vague concept than any other procedural rights,' that it is 'impossible to determine with precision when the right has been denied' 407 U.S. at 519, 521, and concluded that although a defendant's constitutional rights to a speedy trial cannot be established by any inflexible rule, the denial of the right must be determined on an *ad hoc* basis balancing both the conduct of the prosecution and that of the defendant. In enunciating such a 'balancing test' the Court identified four factors as criteria in determining through a 'functional

analysis' whether or not a particular defendant has been denied this Sixth Amendment right."

Judge O'Donnell then discussed the distillate of Maryland decisions preceding *Barker v. Wingo,* pointing out that with a single exception the Maryland standards were identical with it. He then enunciated the course to be followed, in the light of *Barker v. Wingo, supra,* when courts are confronted by an alleged infringement of speedy trial rights assured by the Sixth Amendment. He said at 108-09 [71] of *Epps:*

"Antecedent to the holdings in *Barker v. Wingo, supra,* from a massive corpus of case law — in both this Court and in the Court of Special Appeals certain fundamental principles had been thoroughly distilled. Pre-eminent was that the right to a speedy trial is relative and that the time within which trial must be held to satisfy the constitutional guarantee depends on the facts and circumstances of each particular case; that in evaluating those facts and circumstances on a case-by-case basis four factors came into play. They were: (1) the length of the delay, (2) the reason for the delay, (3) prejudice to the accused and (4) waiver by the accused. *See State v. Lawless,* 13 Md. App. 220, 226-27, 283 A.2d 160, 166 (1972) and cases therein cited at n. 5, 6. Save for the one factor of 'waiver by the accused' the standards applied were identical to those later enumerated in *Barker.*

"Subsequently, the *Barker-Wingo* 'balancing test' and its criteria have been consistently applied by the Court of Special Appeals. *See State v. Hunter,* 16 Md. App. 306, 314-15, 295 A.2d 779, 783 (1972), pointing out that the Supreme Court in *Barker* had rejected 'the rule that a defendant who fails to demand a speedy trial forever waives his right' and had stated that 'the better rule is [that] the defendant's assertion of, or failure to assert, his right to a speedy trial is one of the factors to be considered.' *See also State v. Jones,* 18 Md. App. 11,

16-18, 305 A. 2d 177, 180-81 (1973) which noted that '[i]n the first full analysis of the speedy trial right ever undertaken by the Supreme Court, *Barker* ameliorated the foreclosing effect of waiver, in one of its aspects at least,' when it rejected the 'demand-waiver doctrine' but further observed 'that a defendant's conduct which causes delay will not redound to the detriment of the State, whether the result is reached by simply subtracting this time period from the "delay" factor *ab initio* or by considering it as "waiver," by affirmative conduct.'

"In making our independent constitutional appraisal of whether the appellant was denied his constitutional right to a speedy trial we must under the holding in *Barker v. Wingo* 'engage in a difficult and sensitive balancing process' in which 'the conduct of both the prosecution and the defendant are weighed' and 'considered together with such other circumstances as may be relevant' the four enumerated and related factors. 407 U.S. at 533. Realizing that *Barker* 'prescribes "flexible" standards based on practical considerations,' *Strunk v. United States, supra,* at 438, and that the 'right to a speedy trial is not a theoretical or abstract one but one rooted in hard reality in the need to have [the] charges promptly exposed' *Dickey v. Florida,* 398 U.S. 30, 37 (1970), we must determine whether the State did 'discharge its "constitutional duty to make a diligent, good-faith effort to bring [Epps] [to trial]".' *Moore v. Arizona, supra,* at 26; *Smith v. Hooey, supra,* at 383."

### (a) *The Delay*

The period of delay to which the Court's consideration of the speedy trial issue must be addressed is the period that the accused was subjected to actual restraints imposed by arrest up until his case is tried. *Epps, supra,* at 109 [71-72].

Appellant initially was arrested on April 28, 1972. He was

brought to trial on February 5, 1975. He argues that this entire period is to be counted against the State.

For reasons that will become apparent, we shall divide the delay into three periods of time, namely:

(1) April 28, 1972 to June 29, 1972;

(2) June 30, 1972 to July 9, 1974;

(3) July 10, 1974 to February 5, 1975.

We regard the totality of this interval to be "sufficiently inordinate to constitute a 'triggering mechanism' to engage in the 'sensitive balancing process' of reviewing" the causes of delay. *Epps, supra,* at 111 [72].

## (b) *Reasons for Delay*

### (1) *April 28, 1972—June 29, 1972*

Appellant initially had been arrested on April 28, 1972. The charges against him were dismissed by the State at preliminary hearing on June 29, 1972 for want of probable cause for continued prosecution. There is nothing in the record to suggest an ulterior motive of the State in that dismissal. We find that period well within the bounds of a reasonable and proper interval for the State, in a murder case of this complexity, to examine the evidence then available to it and to make the judgment whether charges against Ward should be dismissed. This period clearly was a justifiable delay, not to be counted against the State. *Epps, supra,* at 111 [72-73].

### (2) *June 30, 1972—July 9, 1974*

Appellant maintains that the period between the date of preliminary hearing — June 29, 1972 — and the date of his second arrest must be counted against the State.

The dismissal of charges on June 29, 1972 terminated all State proceedings against Ward.

Ward was re-arrested on July 10, 1974. In such circumstances the language used in *Hoffa v. U. S.,* 385 U. S.

293, 87 S. Ct. 408, 17 L.Ed.2d 374 (1966), at 310 [417] [386], is particularly pertinent:

> "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."

The Maness disclosures of July 9, 1974 provided the State — for the first time — a quantum of evidence sufficient to support a conviction of Ward. His subsequent arrest caused his reemergence as an accused within the meaning and effect of *U. S. v. Marion*, 404 U. S. 307, 92 S. Ct. 455, 30 L.Ed.2d 468 (1971). *Marion* had pointed out that:

> "* * * it is either a formal indictment or information or else *the actual restraints imposed by arrest and holding* to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." (Emphasis added.) 404 U. S. at 320 [463] ]479].

after having earlier declared:

> "[Appellees] claim that their rights to a speedy trial were violated by the period of approximately three years between the end of the criminal scheme charged and the return of the indictment; it is argued that this delay is so substantial and inherently prejudicial that the Sixth Amendment required the dismissal of the indictment. In our view, however, the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,' an

event that occurred in this case only when the appellees were indicted on April 21, 1970." 404 U. S. at 313, [459] [474].

In the absence of any evidence tending to show that the State released the appellant in order to further its own interests or to damage by delay the interests of the appellant, we hold that for the reasons hereafter stated, this time period does not constitute delay within the purview of a speedy trial analysis.

There is not a scintilla of evidence that the State did or with reasonable diligence could have come into possession of evidence further incriminating to Ward before the disclosures made by Maness during the course of the latter's trial for the murder on July 9, 1974.[3] We again stress that the State caused the initial charges to be dismissed on June 29, 1972 because of a lack of probable cause at that time for the prosecution to be pursued. The good faith [4] of the State is made manifest by the fact that this dismissal had occurred many months before Chief Judge Northrop of the United States District Court for the District of Maryland had suppressed [5] in a Federal prosecution of Ward for possession of illegal firearms, the evidence obtained in the unlawful search of April 28, 1972. The appellant had made no effort in a State court to suppress the seized property prior to indictment. *See* Maryland Rule 729 b 2.

In summary, the record shows: (a) that all State charges against Ward had been dismissed during this period and (b) the absence of any evidence that the dismissal was contrived by the State for an unworthy purpose.

We conclude, accordingly, that Ward was not an accused at any time during the period now under discussion within the meaning of *Marion* and *Epps*, both *supra*. Thus, this period is of no significance in the "balancing test." We consider the cases of *Pitts v. North Carolina*, 395 F. 2d 182

---

3. *Compare*: State v. Wynn, 26 Md. App. 39, 336 A. 2d 800 (1975).

4. *See*: Erbe v. State, 276 Md. 541, 350 A. 2d 640.

5. Chief Judge Northrop passed the suppression order on August 20, 1973.

(4th Cir. 1968) and *Hanrahan v. U. S.*, 348 F. 2d 363 (D.C. Cir. 1965) cited by appellant, to be inapposite. *See*: *Montgomery v. State*, 4 Md. App. 473, 479, 243 A. 2d 620, 624 (1968).

### (3) *July 10, 1974 to February 5, 1975*

Ward was indicted on July 17, 1974. On September 13, 1974 the case was assigned for trial on November 19, 1974.

Counsel for appellant had filed a motion for discovery and inspection on August 8, 1974. The motion was extremely broad in scope, going far beyond the permissible range authorized by Maryland Rule 728. When the State did not answer the motion, the appellant on November 13, 1974 filed a second motion seeking an order to compel the State to answer. The record does not reflect that any court action was taken on either motion. This delay, if delay it is, quite clearly is attributable to the fault of both appellant and the State.

The trial court continued the case on November 18, 1974 at the request of the State. The stated grounds of the State's motion were:

"1. That the jury panel which tried the co-defendant Harry E. Brockman Criminal Trial 12416, in a week long trial from October 21 through the early morning hours of October 26 is sitting on jury duty this week.

2. That the co-defendant was convicted of murder in the first degree in a case which received considerable publicity from the local press.

3. That the Assistant State's Attorney assigned to this case has been advised that there has been much discussion amongst members of the panel in the prior case and the results of the trial.

4. The defendant has on this date filed a Motion for a Speedy Trial which motion the State does not object to.

5. That the trial date of November 19, 1974, is the first trial date set in this case."

There is nothing in the record to indicate that the cited factors were untrue. The case was immediately rescheduled for and was tried on February 5, 1975.

### (c) *Defendant's Assertion of Right*

Defendant's demand for a speedy trial was first asserted on November 15, 1974. He filed a motion to dismiss the indictment on January 31, 1975. The motion was denied prior to commencement of the trial on February 5, 1975.

### (d) *Prejudice to the Defendant*

Appellant's claim of prejudice asserts only (a) "That the State delayed Defendant's case until the only witness, Jesse Stephens, who could clear him died" and (b) "That said long delay from April 28th, 1972 to present January 1975 is an unconscionable delay that has deprived Defendant of his ability to Defend himself." The record shows that the witness Stephens died in 1973.

### *The Balancing*

The accountable period of delay is from July 10, 1974 to February 5, 1975. Appellant was indicted on July 17, 1974. Trial initially was set for November 19, 1974. We do not regard that interval as inordinately protracted in a case of this complexity.[6] There is no evidence that this portion of the delay was "purposeful or oppressive." *Pollard v. U. S.*, 352 U. S. 354, 361, 77 S. Ct. 481, 486, 1 L.Ed.2d 393, 399 (1957).

The delay from November 19, 1974 to February 5, 1975 is, of course, attributable exclusively to the State. The State's motion for continuance, however, attributed its action in large measure to a desire to assure that the accused receive a fair and impartial trial by an unprejudiced jury. There is no

---

6. In Smith v. United States, 360 U. S. 1, 10, 79 S. Ct. 991, 997, 3 L.Ed.2d 1041, 1048 (1959), it was said: "While justice should be administered with dispatch, the essential ingredient is orderly expedition and not mere speed."

In State v. Dubose, 17 Md. App. 292, 299, 301 A. 2d 32, 35 (1973), it was said: "The charge was murder, and such a crime tolerates more delay in any event than a less serious offense."

evidence controverting the factual basis recited as the cause of that motion.

In balancing the other factors we have noted that appellant did not assert his right to a speedy trial until November 15, 1974. The only particularized suggested prejudice is said to have arisen as a result of the death of Stephens. The assertion that Stephens — himself charged as an accomplice in the murder — somehow would "clear" Ward of complicity in the offense is at best the purest conjecture, and must be considered in the light of the circumstance that the co-conspirator Brockman declined to testify on Fifth Amendment grounds when called as a witness by the appellant. More importantly, even if we assume that Ward was prejudiced by the death of Stephens, it is plain that such prejudice was not the product of any State transgression. His death occurred in 1973 — during the period excluded from our speedy trial inquiry. The bald statement that delay "has deprived Defendant of his ability to Defend himself" is not supported by other specific claims of harm.

The appellant was on bail from the time of his indictment until the time of his conviction. He had been admitted to bail, as well, during the period between initial arrest and dismissal.

After balancing all factors, we conclude under our constitutionally mandated examination of the entire record, that the appellant was not denied his constitutional right to a speedy trial.

## (5) *Sufficiency of Evidence*

We find this issue to be frivolous. There is abundant evidence: (1) that appellant conspired with others to cause the murder of his wife; (2) that Gerry Godbout was killed by one of the co-conspirators in the ensuing attempt to kill her; and (3) that appellant was an accessory before the fact of that murder.

*Judgments affirmed.*