### BUFORD CLAYTON HERBERT *v.* STATE OF MARYLAND

[No. 570, September Term, 1969.]

*Decided October 7, 1970.*

---

The cause was argued before MURPHY, C.J., and ORTH and THOMPSON, JJ.

*Henry C. Engel, Jr.,* and *Stephen A. Tarrant* for appellant.

*James F. Truitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edwin H. W. Harlan, Jr., State's Attorney for Harford County,* and *Donald G. Smith, Assistant State's Attorney for Harford County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

These two appeals in one record present a question of law: does the Fourth Amendment protection against unreasonable searches and seizures apply only to govern-

mental action? We find that it does. This finding poses a question of fact: was the seizure of the challenged evidence in these cases by governmental action? We find that it was not. Therefore we hold that the evidence was properly admitted and affirm the judgments.

## THE LAW

Amendment IV to the Constitution of the United States, one of ten amendments proposed by Congress on 25 September 1789 and declared ratified on 15 December 1791, provides "Security from Unwarrantable Search and Seizure":

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

It was not until 1914, however, that the Supreme Court, in *Weeks v. United States,* 232 U. S. 383, for the first time held that in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure. But it was no bar to the use of such evidence in state prosecutions and thirty-five years later in *Wolf v. Colorado,* 338 U. S. 25 (1949) the Court still felt and so decided that the exclusionary rule should not be imposed upon the States as "an essential ingredient of the right." 388 U. S. at pages 27-29. However, in 1956 in *Rea v. United States,* 350 U. S. 214 the Court formulated a method to prevent the state use of evidence unconstitutionally seized by federal agents.[1] And in *Elkins v. United States,* 364 U. S. 206 (1960) it discarded the "silver platter" doctrine which permitted "the federal

---

1. The posture of *Rea,* said the Court, did not raise a constitutional question but one concerning "our supervisory powers over federal law enforcement agencies." 350 U. S. at 217.

government to avail itself of evidence improperly seized by state officers operating entirely on their own account" under the holding in *Byars v. United States*, 273 U. S. 28 (1927) at 33.[2] Then in 1961 the Court closed "the only courtroom door left remaining open to evidence secured by official lawlessness in flagrant abuse of that basic right [against unreasonable searches and seizures], reserved to all persons as a specific guarantee against that very same unlawful conduct." In *Mapp v. Ohio*, 367 U. S. 643 the Court held that "all evidence obtained by searches and seizures in violation of the Constitution, is by that same authority, inadmissible in a state court." At 655.

It was early considered by the Supreme Court that the Fourth Amendment protection against unreasonable searches and seizures applied only to governmental action. Such construction has been consistently followed and is firmly established. The only change, as has been pointed out, was that it was finally decided that the protection applied to state governmental action as well as federal governmental action. The Court put it concisely in *Burdeau v. McDowell*, 256 U. S. 465 (1921) at 475:

> "[The Fourth Amendment's] origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued."

The Court traced the history of the Amendment in *Boyd*

---

2. In *Lustig v. United States*, 338 U. S. 74 (1949) the Court said of the *Byars* holding: "The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter." At 78-79.

*v. United States,* 116 U. S. 616 (1886) observing, at 625 that "in order to ascertain the nature of the proceedings intended by the Fourth Amendment to the Constitution under the terms 'unreasonable searches and seizures', it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England." Recalling the history, *Boyd* showed, as stated in *Weeks v. United States, supra,* at 390:

> "[I]t took its origin in the determination of the framers of the Amendment to the Federal Constitution to provide for that instrument a Bill of Rights, securing to the American people, among other things, those safeguards which had grown up in England to protect the people from unreasonable searches and seizures, such as were permitted under the general warrants issued under authority of the government, by which there had been invasions of the home and privacy of the citizens, and the seizure of their private papers in support of charges, real or imaginary, made against them. Such practices had also received sanction under warrants and seizures under the so-called writs of assistance, issued in the American Colonies."

Mr. Justice Bradley concluded in *Boyd* that the principles embodied in the Fourth Amendment "apply to all invasions *on the part of the government and its employees* of the sanctity of a man's home and the privacies of life." At 391 (emphasis supplied). In *Silverthorne Lumber Co. v. United States,* 251 U. S. 385 (1920) Mr. Justice Holmes in the opinion holding that rights against unlawful search and seizure had there been violated, noted that the case was not that of knowledge acquired through the wrongful act of a stranger, but that the government planned or at all events ratified the whole performance. He said, at 392: "If knowledge of them [the facts ascertained from seized documents] is gained from an independent source

they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed [to obtain indictments]." In *Irvine v. California*, 347 U. S. 128 (1954) the Court said that the decision in *Wolf v. Colorado, supra*, "for the first time established that '[t]he security of one's privacy against arbitrary intrusion *by the police'* is embodied in the concept of due process found in the Fourteenth Amendment." At 132 (emphasis supplied). In *Elkins v. United States, supra*, it was made clear that at that time the limitations of the Fourth Amendment reached only "the Federal government and its agencies." 364 U. S. at 210. And when in *Mapp v. Ohio, supra*, the Fourth Amendment was recognized as reaching through the Fourteenth Amendment, state governments and their agencies as well as the federal government and its agencies, it was nonetheless clear that only *governmental action* was encompassed. "[W]e can no longer permit [the Fourth Amendment] to be revocable at the whim of *any police officer* who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." 367 U. S. at 660 (emphasis supplied). We believe that by history, judicial rule and application, the exclusionary rule as to evidence seized in violation of the Fourth Amendment comes into play only when the evidence is obtained by governmental action. Whatever wrong is done by the act of one individual in taking the property of another, it is no invasion of the security afforded by the Fourth Amendment against unreasonable searches and seizures. *Burdeau v. McDowell, supra*, at 475.[3] When an

---

3. We are not concerned here with what redress a person may have against those who illegally and wrongfully took his private property.

individual obtains incriminatory matter from an accused, no matter how improperly, and such matter comes into the possession of the government without a violation of the accused's rights by governmental authority, the exclusionary rule does not prohibit its use at trial.

> "We know of no constitutional principle which requires the government to surrender the papers under such circumstances. Had it learned that such incriminatory papers, tending to show a violation of federal law, were in the hands of a person other than the accused, it having had no part in wrongfully obtaining them, we know of no reason why a subpoena might not issue for the production of the papers as evidence. Such production would require no unreasonable search or seizure, nor would it amount to compelling the accused to testify against himself.
>
> The papers having come into the possession of the government without a violation of petitioner's rights by governmental authority, we see no reason why the fact that individuals, unconnected with the government, may have wrongfully taken them, should prevent them from being held for use in prosecuting an offense where the documents are of an incriminatory character." *Id.* at 476.

Each case must be judged on its own particular facts as to whether or not governmental action played such a part in the seizure of challenged evidence so as to invoke the Fourth Amendment. In *Gouled v. United States*, 255 U. S. 298 (1921), it was suspected that Gouled and another were conspiring to defraud the government through contracts with it for clothing and equipment. A private in the Army, attached to the Intelligence Department, and who was also a business acquaintance of Gouled, under direction of his superior officers, pretending to make a friendly call on Gouled, gained admission to his office in

his absence, without warrant of any character, seized and carried away several documents. One of them was subsequently delivered to the United States District Attorney, and was by him introduced in evidence over objection. The Court held, at 306:

> "[W]hether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence, falls within the scope of the prohibition of the Fourth Amendment * * *."

In *Lewis v. United States*, 385 U. S. 206 (1966) the accused invited a government undercover agent to his home for the specific purpose of executing a felonious sale of narcotics. "During neither of his visits to [accused's] home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by [accused] as a necessary part of his illegal business." At 210. The Court found no further elaboration necessary than the summary by the Government in its brief, which it quoted at 212:

> "In short, this case involves the exercise of no governmental power to intrude upon protected premises; the visitor was invited and willingly admitted by the suspect. It concerns no design on the part of a government agent to observe or hear what was happening in the privacy of a home; the suspect chose the location where the transaction took place. It presents no question of the invasion of the privacy of a dwelling; the only statements repeated were those that were willingly made to the agent and the only things taken were packets of mari-

huana voluntarily transferred to him. The pretense resulted in no breach of privacy; it merely encouraged the suspect to say things which he was willing and anxious to say to anyone who would be interested in purchasing marihuana."

And see *Hoffa v. United States*, 385 U. S. 293 (1966), in which the Court found that "no interest legitimately protected by the Fourth Amendment is involved." At 302.

## THE FACTS

Buford Clayton Herbert was charged under indictment 3619 with possession and control of marijuana on 8 January 1969 and under indictment 3618 with possession and control of marijuana on 9 January 1969. The indictments were separately tried without a jury in the Circuit Court for Harford County and he was found guilty under each of having marijuana in his possession. The conviction in each case was predicated upon the admission in evidence, upon the denial of a pretrial motion to suppress heard and determined during the trial on the general issue, of a corncob pipe shown to contain traces of marijuana. Both of these pipes were taken from appellant's home, one on 8 January by John Keithley and the other on 9 January by Ernest B. Yoder. They were subsequently turned over to a trooper of the Maryland State Police who produced them at the trials. Appellant claims that the warrantless seizure of these articles from his home was in violation of his Fourth Amendment rights and therefore the lower court erred in denying his motion to suppress them. In the light of the rule of law we have discussed, the question is whether the pipes were seized by governmental action. If they were not, the sanctity of the Fourth Amendment was not violated, they were properly admissible in evidence, and the court did not err in denying the motion to suppress.

As a claim of a constitutionally protected right is involved, it is our duty to make an independent examination of the whole record. *Cox v. Louisiana*, 379 U. S. 536, 545,

n.8. It was adduced that Yoder first met Trooper Warren Pitt of the Vice and Narcotic Division of the Maryland State Police in January 1968. Yoder told his attorney he was willing to assist the State Police in investigating narcotic traffic and the attorney arranged a meeting with the Trooper. As a result of the meeting he from time to time gave information to the police and turned over to them evidence he obtained. Yoder and Keithley had been close friends "for quite sometime" and discussed Yoder's activities. Asked how he met Pitt, Keithley said, "Well, Mr. Yoder told me about what he was doing and that — if I would help, and I said that I would and at a later date (about the middle of October 1968) I met with Trooper Pitt and told him I would work with the State Police." Pitt told them that any evidence they "did obtain would be most helpful in Court." He "advised" them "as to the nature of the items in which he was interested," and "how to keep them and turn them over to him and so forth." They had discussed with the Trooper the possibility of going to pot parties and what to do upon attending them. If they wanted to attend such a party and did attend they were to obtain such evidence they could. The Trooper suggested the type of evidence, "such as a pipe." Neither received any compensation for their activities, nor did the Trooper tell them exactly "what to do or where to go," only "general directions as to what type of evidence to secure, and where to get it and so forth— and the manner in which to acquire it."

Keithley and Yoder heard there was to be a pot party at appellant's residence on 8 January 1969. Keithley had known Herbert for a number of years. Keithley arrived at the party about 7:30 P.M. "Upon arriving I seen Rick Dennis, Bill Woodland, Jim Conrad, Terry Hart, Kevin Hughes, Buford Herbert and Charles Horner. * * * Shortly after I arrived, Rick Dennis took out what appeared to be marijuana and put it in a pipe and began smoking it and passing this pipe around to individuals in the room." Yoder arrived at the party about 9:00 P.M. when the pipe was being passed around and smoked.

Keithley and Yoder left the premises about 1:00 A.M. the next morning. Keithley took the pipe. "It was laying in an ashtray on the arm of the chair where I was sitting." He gave the pipe to Yoder who kept it in a small, green, metal box under lock and key until 15 January when he turned it over to Trooper Pitt.

Yoder and Keithley went to appellant's home on 9 January about 8:30 P.M. Yoder testified, "I had been told that they were planning a small party. * * * I saw Buford Herbert, Charles Horner and Rick Dennis in the living room. * * * Shortly after entering the home, Rick Dennis left and returned about five minutes later. He had in his hand a clear plastic bag, which contained a greenish-brown vegetable substance that I suspected to be marijuana. Rick Dennis placed the substance in a pipe, lit the pipe and began smoking from it. Charles Horner and Buford Herbert joined Dennis in smoking the pipe." Yoder and Keithley left about 1:00 A.M. the next morning. Yoder said, "Before leaving the home, I took the pipe from the ashtray which was placed on the arm of the sofa * * * put it in my pocket * * * took it to my home. Upon reaching my home, I put it in a green metal box under lock and key." He gave it to Trooper Pitt on 15 January.

The record is clear the taking of the pipe in each case was not incident to an arrest, was not under color of a warrant and was not by consent of appellant or of Dennis, who on each occasion produced the marijuana, or of any of the others who smoked it. The record is also clear that Trooper Pitt did not know that Yoder and Keithley were going to appellant's home. It seems that Trooper Pitt did not know that Keithley and Yoder were going to the party either night. As to the party of 8 January Yoder said he had not talked to Pitt about going to "this particular one," although Keithley was not sure whether Pitt knew there was to be a party. As to 9 January Yoder stated positively that Pitt did not know he was going "to this particular place for a party," nor did Pitt know he was going to a party on 8 or 9 January. "No sir, not on

those dates, but he knew I might go to a party throughout the course of the investigation."

Yoder's and Keithley's testimony with regard to their relationship with the police was not disputed. If they fit within any of the classifications of informers set out in *Nutter v. State,* 8 Md. App. 635, n.1 at 637-638 it is as "casual informers"—those who have associations and information useful to the police. As to them, police involvement begins at the end of the process, not the beginning. They volunteered their services to the police to aid in the enforcement of the narcotic laws. In denying the motion to suppress, it seemed to the lower court "that you have here the situation of two private citizens picking up a pipe belonging to some unknown people." It said:

> "In this particular case, this Trooper did not know that these two young men were attending a party on this particular night; did not have any idea apparently that they had any evidence until a week after the actual taking; they were not under his specific direction at the time of this party, and I doubt if they were under his general direction. They operated on his advice and suggestion, but only because he is theoretically an expert in the field. I can't see where there was any master-servant relationship or agency relationship, so that I can't—The Court just cannot say that these two young men were acting as government officials."

By an independent, reflective constitutional judgment on the facts we reach the same conclusion as did the lower court. The decisive factor is the actuality of a share by a government official in the total enterprise of securing and selecting evidence by other than sanctioned means. See *Lustig v. United States, supra,* at 79. We feel that the actuality of the share by the police in the total enterprise of obtaining the evidence here challenged was not sufficient to bring into play the sanctity of the Fourth Amendment. In short, the seizure of the evidence was not by governmental action and the rule invoked by violation of

the constitutional right against unreasonable searches and seizures did not apply to exclude the pipes.

*Judgment under each of indictments no. 3618 and no. 3619 affirmed.*[4]

---

4. The docket entries show the sentences as follows:
   On the conviction under indictment 3618:
   "Sep. 19-1969 Sentence of the Court (Judge Dyer) that the Deft., Buford Clayton Herbert, shall be confined in the Harford County Jail for a period of one (1) year, of which the first month is to be served under the provisions of Art. 27, Sec. 645-K, (Deft. to be incarcerated during weekends—released during work week) and the remaining eleven (11) months to be placed on probation under the supervision of the State Dept. of Parole and Probation."
   On the conviction under indictment 3619:
   "Sep. 19-1969 Sentence of the Court (Judge Dyer) that the Deft., Buford Clayton Herbert, shall be confined in the Harford County Jail for a period of one (1) year, of which the first month is to be served under the provisions of Art. 27, Sec. 645-K, (Deft. to be incarcerated during weekends—released during work week) and the remaining eleven (11) months to be placed on probation under the supervision of the State Dept. of Parole and Probation. The sentence shall run concurrent or consecutive depending upon Deft's behavior. (See case no. 3618)."
   On 23 September the sentences were amended so that defendant "shall not be incarcerated when not working." Although Ch. 237, Acts 1970, applies to these cases, each sentence is within the maximum prescribed by that statute. See *Nutt v. State,* 9 Md. App. 501; *Oberlin v. State,* 9 Md. App. 426. Appellant does not raise a question on this appeal concerning the contingent nature of his sentence on the conviction under 3619—that it shall run concurrent or consecutive depending upon his behavior—and we do not consider it.