790 A.2d 660

**STATE of Maryland,**

v.

**Charles Terrence COLLINS.**

**No. 59, Sept. Term, 2001.**

Court of Appeals of Maryland.

Feb. 7, 2002.

702

Leigh S. Halstad, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for petitioner.

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

The State of Maryland (petitioner) seeks review of a judgment of the Court of Special Appeals of Maryland remanding the case to the Circuit Court for Washington County for additional suppression hearing proceedings. The Court of Special Appeals held that the bail bond agents in the case *sub judice* were, in fact, acting as state actors for purposes of the Fourth Amendment due to the extent of the participation by the police officer who accompanied them as part of a "service to stand by" procedure that apparently exists in Washington County.

On March 21, 2000, respondent was convicted of possession of marijuana with intent to distribute and simple possession after a bench trial in the Circuit Court for Washington County. The Circuit Court sentenced respondent to five years imprisonment, all suspended, with three years probation, on the possession of marijuana with intent to distribute conviction. The Circuit Court imposed a concurrent one-year term, with concurrent probation, on the possession of marijuana conviction.

On March 22, 2000, respondent noted an appeal from the ruling of the Circuit Court to the Court of Special Appeals. The Court of Special Appeals reversed the Circuit Court and remanded the case for reconsideration of the motion to suppress evidence.

On August 16, 2001, we granted the State's Petition for Writ of Certiorari to review the holding of the Court of Special Appeals. Petitioner presents one question for our review:

"Did the Court of Special Appeals err in finding that two bail bonds agents, who entered an apartment to look for their defaulting principal, were agents of the State for the purpose of the Fourth Amendment because an accompanying police officer initially knocked on the apartment door, was denied entry and remained outside of the apartment?"

We affirm the intermediate court's holding that the participation, beyond mere presence, of the accompanying police officer in this case conferred the status of state action for

purposes of the Fourth Amendment to the actions taken by the two bail bond agents toward respondent. While bail bond agents are generally not state actors for Fourth Amendment suppression purposes, in this case, because of the extent of participation by the police officer, they were acting as agents of the State and respondent is entitled to a further suppression hearing and a ruling on excluding the evidence gained initially and following the alleged illegal entry by the two agents.

## I. Facts

In *Collins v. State*, 138 Md.App. 300, 771 A.2d 478 (2001), as to the questions at issue here, the Court of Special Appeals adopted the evidence proffered at the suppression hearing as the facts of this case. The facts, as set forth in the Court of Special Appeals's opinion, are:

"At the hearing on the motion to suppress, Officer Carl Hook [of the Hagerstown Police Department] was the only witness. He testified that he was advised by another officer [Officer David Long] to meet with two persons in the business of arranging bail bonds, Tanya Baer and Donna Morris. They advised him that they wanted to apprehend a 'wanted subject,' Dale Michael Estep, and that he had been seen going into 126 East Avenue in Hagerstown. Officer Hook accompanied the bail bond agents to that residence. He explained that he was performing a 'service to stand by,' which meant that he was not to intervene unless there was a criminal matter that took place. He testified that such service was routinely provided under the circumstances present here.[1] Officer Hook had no information other than that supplied to him by the bail bond agents.

1. Officer Hook testified generally that a "service to stand by" is a service, for the protection of bail bond persons, police routinely perform by accompanying the bond person to the residence. The record reflects that similar accompaniment by a police officer is common in *ex parte* orders in domestic cases and in situations where people need protection to retrieve clothing or belongings from a place.

"The residence at 126 East Avenue was an apartment house containing four apartments. There was a porch on the front of the residence with an entrance from the porch to the apartment in question.

"After Officer Hook and the two agents arrived at the entrance to the apartment, Officer Hook knocked on the door. The door was opened by appellant, who came out and closed the door behind him. Officer Hook stated that they were there for a 'wanted subject' and asked for permission to come in to check the residence. Appellant advised that Estep was not there, that he had not seen him for two weeks, and refused entry into the residence. Ms. Baer stated that she was going to enter the residence whether appellant liked it or not. Appellant again refused but called another person, who came outside to the porch. Officer Hook testified that Ms. Baer spoke to that person and knew him as 'Jimmy.' [2] 'Jimmy' stated that Ms. Baer could go inside and check the residence. Ms. Baer and Ms. Morris went inside. Although appellant was standing at the door, he did not object; nor did he try to stop them. Officer Hook stood near the door, which was still open. The officer said that he detected an odor of burnt marijuana coming out of the residence.

"When Ms. Baer and Ms. Morris exited the apartment [the record reflects they exited a few minutes later], Ms. Baer stated that she had seen approximately fifteen marijuana plants inside, ranging in size from 'beginning plants' to three feet in height [and that Mr. Estep was not in the apartment and it was at this time that respondent went back into the apartment]. Officer Hook testified that he called for backup and three officers responded [Officers Gilbert, Long, and Miller]. Officer Hook explained that he called for backup because of the odor of marijuana. After the other officers arrived, Ms. Baer advised Officer Hook

---

2. From the time Ms. Baer stated she was going to enter until the time when "Jimmy" came outside was, according to Officer Hook's testimony, less than a minute.

that she had just seen appellant running in the alley at the rear of the apartment. Officer Hook then noticed appellant [respondent] running with a black plastic garbage bag. Officer Hook pursued appellant on foot. Appellant dropped the bag, [went approximately ten more feet] and the police took him into custody. In the bag, although not visible prior to searching it, the police found 'pot[s] of marijuana plants, high intensity lamp, electric scales, a multi-colored bag that contained marijuana seeds, and a pipe with marijuana residue.'

"A search warrant [3] was obtained for the apartment, and additional evidence was seized. Appellant moved to suppress the items seized from his person and the apartment, arguing that they were the fruits of the poisonous tree because his arrest was illegal and the warrant was based on information obtained during the bail bond agents' prior illegal entry.

"The suppression court ruled that (1) Officer Hook was credible; (2) the bail bonds agents were not State actors; and (3) Officer Hook had probable cause to arrest appellant and search the bag, based upon (A) the smell of marijuana emanating from the apartment, and (B) Ms. Baer's statement that marijuana plants were inside the apartment. Consequently, according to the suppression court, the subsequent search of the apartment pursuant to a warrant was also legal."

*Id.* at 303–05, 771 A.2d at 480–81 (some alterations in original).

## II. Discussion

### a. Standard of Review

Our review of a Circuit Court's denial of a motion to suppress evidence under the Fourth Amendment is limited,

---

**3.** Officer Hook testified that the officers made contact with the Narcotics Task Force and after advising them of the situation, the Narcotics Task Force obtained a search warrant to search the apartment based on the odor of marijuana from the apartment, Ms. Baer's observations, and the items discovered in the bag.

ordinarily, to information contained in the record of the suppression hearing and not the record of the trial. *See Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999); *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691, 693 (1997); *Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22, 22 (1990); *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1987). When there is a denial of a motion to suppress, we are further limited to considering facts in the light most favorable to the State as the prevailing party on the motion. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Simpler,* 318 Md. at 312, 568 A.2d at 22. In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to the weighing and determining first-level facts. *Lancaster v. State,* 86 Md.App. 74, 95, 585 A.2d 274, 284 (1991); *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356, 358 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430, 435 (1992); *Riddick,* 319 Md. at 183, 571 A.2d at 1240. Even so, as to the ultimate conclusion of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick,* 319 Md. at 183, 571 A.2d at 1240; *Munafo v. State,* 105 Md.App. 662, 669, 660 A.2d 1068, 1071 (1995).

### b. Fourth Amendment Guarantee

The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures by government, not private individuals. *See United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984); *Waters v. State,* 320 Md. 52, 60, 575 A.2d 1244, 1247–48 (1990). The protections of the Fourth Amendment are applicable to the State of Maryland through the Fourteenth Amendment of the United States Constitution. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Owens v. State,* 322 Md. 616, 622,

589 A.2d 59, 61 (1991). "The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985); *see In re Tariq A–R–Y*, 347 Md. at 490, 701 A.2d at 693.

■ In addition, even where the police have some connection to a search and seizure by a private party, the Fourth Amendment has been held not to apply where the police do not attempt to coerce, dominate or direct the private party. *Coolidge v. New Hampshire*, 403 U.S. 443, 489–90, 91 S.Ct. 2022, 2049–50, 29 L.Ed.2d 564, 596 (1971). So, generally, when a private party acts for his or her own purpose without police instigation or participation, and subsequently gives seized items to the police, there is no State action. *Coolidge*, 403 U.S. at 486–90, 91 S.Ct. at 2048–50, 29 L.Ed.2d at 594–96. This general rule of non-agency, however, does not mean that private actors cannot become state actors based on the facts of a particular case. *Id.*

■ In the case *sub judice,* the burden rests upon respondent to establish government involvement and to thereby be entitled to suppress evidence that was seized in violation of the Fourth Amendment, as "the burden of establishing government involvement in a private search rests on the party objecting to the admissibility of the evidence." *Waters,* 320 Md. at 60, 575 A.2d at 1247–48.

■ Finally, when determining if a search or seizure by a private individual invokes the Fourth Amendment, the question is "if the private individual whose actions are in question, 'in light of all the circumstances of the case, must be regarded as having acted as an "instrument" or agent of the state.' " *Id.* at 57, 575 A.2d at 1246 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564, 595 (1971)).

### c. Bail Bond Agents

In Maryland, the bail bond system is governed by statute and Rule. *See* Md.Code (2001), Title 5 *Release*, Subtitle 2 *Pretrial Release* of the Criminal Procedure Article; Md. Rules 4–216 and 4–217. Further, bail bond agents are subject to strict regulations and licensing requirements by various other provisions of the Maryland Code.[4] In *Shifflett v. State*, 319 Md. 275, 572 A.2d 167 (1990), we affirmed the Court of Special Appeals and held that bail bond agents have broad common law powers to arrest principals, much greater than the powers normally possessed by private citizens. We stated:

"The jury convicted the petitioner, and she was sentenced to three years' imprisonment on the resisting arrest and battery convictions. The Court of Special Appeals affirmed the judgments. *Shifflett v. State*, 80 Md.App. 151, 560 A.2d 587 (1989). It held that the bail bondsmen's authority under the common law to arrest the principal was broader than that of a private citizen to arrest. It quoted at length from *Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 371–72, 21 L.Ed. 287 (1872), as follows:

'When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge, and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State, may arrest him on the Sabbath, and if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.... In [Anonymous,] 6 Modern [231], it is said:

---

4. *See* Maryland Code (1977, 2001 Supp.) sections 10–301–10–308 of the Insurance Article and Maryland Code (2001), sections 5–203(a) and 5–210(b) of the Criminal Procedure Article for illustrations of the types of regulations, requirements, and/or limitations faced by bail bond agents.

"The bail have their principal on a string, and may pull the string whenever they please and render him in their discharge." ' "

*Shifflett v. State*, 319 Md. 275, 277, 572 A.2d 167, 168 (1990) (alteration in original).[5]

We have held that the fact that a private person must be licensed by the State to engage in their employment does not make that person a "State agent" for Fourth Amendment search and seizure purposes. In *Waters v. State*, 320 Md. 52, 575 A.2d 1244 (1990), Waters argued that the cocaine taken out of his pocket by a security guard, Paul Madden, was seized in violation of the Fourth Amendment prohibition against unreasonable search and seizures because the security guard was acting as a State agent. Specifically, Waters contended that because private detective agencies were regulated and licensed by the State, private security guards that work for private detective agencies are similar to special police officers "who are commissioned by the Governor and exercise general police powers in the protection of their employer's property." *Id.* at 55, 575 A.2d at 1245. Therefore, Waters alleged that Madden's seizure of the cocaine from his pocket involved state action and should not be admissible at trial because it was unreasonable.

We held that the mere licensing and regulation of the security guards, without being vested with arrest or other police powers, was not enough to qualify the security guards as State agents. We stated:

"As employees of detective agencies engaged to guard the property of their employer's clients, security guards have

---

**5.** For cases generally supporting bond persons' powers, *see Landry v. A–Able Bonding*, 75 F.3d 200, 203–05 (5th Cir.1996) (stating that a bond person is not a state actor if he does not act pursuant to a warrant or enlist the aid of law enforcement officials); *Bennett v. State*, 169 Ga.App. 85, 86, 311 S.E.2d 513, 515 (1983) (comparing bond persons' powers of arrest to those of law enforcement officers); *State v. Portnoy*, 43 Wash.App. 455, 466, 718 P.2d 805, 811 (1986) (recognizing the extraordinary powers).

not been granted police powers by statute and therefore are not state agents in any traditional sense for purposes of the Fourth Amendment. Without governmental powers, security guards are acting as private citizens when protecting property, and their private status is not altered because their interest in protecting property coincides with the public's interest in preventing crime generally.... Moreover, mere state licensing of a private individual's occupation, without more, does not constitute sufficient state control to make the individual a state agent. Nor does extensive state regulation of itself convert the actions of those regulated into state action.

. . .

"The only evidence in the case was that Madden was a licensed security guard at the time he seized the plastic bags, and the trial judge so held. Water's argument that Madden was a state agent is wholly unconvincing. Consequently, Judge Goudy correctly determined that the seized cocaine was admissible in evidence, there being no showing (or even an allegation) that Madden was working in collusion with the police at the time of the search, or otherwise acted as an instrument of the State in the performance of his duties."

*Id.* at 59–60, 575 A.2d at 1247–48 (citations omitted). Bail bond agents, who are licensed and regulated by the State, do not have police powers by statute and are not, generally, State agents. Therefore, bail bond agents are generally not State actors for Fourth Amendment suppression purposes. In the case *sub judice*, however, the facts demonstrate that due to the extensive participation by the officer in leading the attempt to effect entry into the apartment, the bail bond agents were working in substantial collusion with the police.

### d. "State Action" Status and Our Case

#### i. State Action Analysis

As we have stated, *supra,* when a private party acts for his or her own purpose without police instigation or participation

and obtains evidence, if the party later gives the seized evidence to the police, there is no State action. *See Bowers v. State,* 298 Md. 115, 138–40, 468 A.2d 101, 113–14 (1983) (holding that the search of a hotel room by the hotel's accounting supervisor did not amount to State action even though the motel had a State business license and did not necessitate suppression of evidence), *superseded by statute on other grounds, Doering v. State,* 313 Md. 384, 545 A.2d 1281 (1988); *Knight v. State,* 59 Md.App. 129, 134–35, 474 A.2d 947, 949–50 (1984) (trespassing roofer who reported information to police not a State actor); *Ward v. State,* 30 Md.App. 113, 116–17, 351 A.2d 452, 454–55 (1976) (search and seizure by member of family not State action); *Herbert v. State,* 10 Md.App. 279, 290–91, 269 A.2d 430, 435–36 (1970) (private parties, who acted as "criminal informers" for the police, who seized evidence at a party and turned it over to police, are not state actors).

In the federal circuits and some other states, there are even cases involving police "stand by" type services, the type of service involved in the case at bar, where various courts have declined to find "State action." *See generally United States v. Dahlstrom,* 180 F.3d 677 (5th Cir.1999) (stating that third party search in a police officer's presence was not State action where officer was present on a peacekeeping duty), *cert. denied,* 529 U.S. 1036, 120 S.Ct. 1530, 146 L.Ed.2d 345 (2000); *United States v. Coleman,* 628 F.2d 961 (6th Cir.1980) (holding that police accompaniment to a residence while third party effectuated repossession of vehicle, and third party gives evidence found in repossessed vehicle to police not to be State action); *State v. Patch,* 142 N.H. 453, 456–58, 702 A.2d 1278, 1280–82 (1997) (concluding no state action where officer who served restraining order on third party, waited for the third party to gather belongings, which belongings included evidence of defendant's criminal activity which was later given to the police by the third party).

There, however, appears to be no bright-line test that determines government from private conduct in these types of situations. The Court of Special Appeals, while holding, generally, that bail bond agents are not State actors, recognized

the authority outside of Maryland representing the proposition that bail bond agents may sometimes be State actors for certain purposes.

The Court of Special Appeals, in its opinion in this case, mentioned the Fourth Circuit case of *Jackson v. Pantazes*, 810 F.2d 426, 430 (4th Cir.1987), wherein the Fourth Circuit Court of Appeals stated, in *dicta*, that in Maryland the bail system co-exists in a symbiotic relationship, making the bail bond agents vulnerable to civil liability under 42 U.S.C. section 1983. In the next sentence, however, the intermediate appellate court noted a line of federal cases, involving bail bond agents and state actor issues from the Fifth, Eight and Ninth circuits that have rejected the theory of symbiotic relation rendering bail bond agents *per se* State actors in the context of section 1983 actions.[6]

These federal circuit cases did not involve motions to suppress under the Fourth Amendment, the issue presented in the case *sub judice*, and we do not accept as persuasive those federal circuit cases finding *per se* state action from the simple fact that bail bond persons are involved. We believe the better view involves a case by case analysis, where the presence of "State action" depends upon the acts of the parties and the circumstances involved in the particular case. In *In re Albert S.*, 106 Md.App. 376, 386, 664 A.2d 476, 481 (1995), the Court of Special Appeals stated that State action "is not measured by the primary occupation of the actor, but by the *capacity* in which he [or she] acts at the time in question."

Our case of *Waters, supra* (although we failed to find state action), at least to a degree, recognized the test set forth in *In re Albert S.* While we held that *per se* "State action" status was not created by mere licensing of security guards, we left room for "State actor" status for private individuals depending upon the context of the actions undertaken. We said:

---

**6.** *See Landry v. A-Able Bonding*, 75 F.3d 200, 204–05 n. 5 (5th Cir. 1996); *Dean v. Olibas*, 129 F.3d 1001, 1006 n. 4 (8th Cir.1997); *Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547, 553 (9th Cir.1974).

"Moreover, *mere* state licensing of a private individual's occupation, *without more,* does not constitute sufficient state control to make the individual a state agent.

"The burden was upon Waters, as the proponent of the motion to suppress, *to establish* that his Fourth Amendment rights were violated by the challenged search and seizure. In the same vein, the burden of establishing government involvement in a private search rests on the party objecting to the admissibility of the evidence."

*Waters v. State,* 320 Md. 52, 59–60, 575 A.2d 1244, 1247–48 (1990) (citations omitted) (emphasis added). While we held that Waters had failed to meet the burden, we implicitly acknowledged that if the burden were met, private action could be transformed into State action for Fourth Amendment purposes.

As we have indicated, other courts had addressed when conduct involving private actors becomes government conduct. In *United States v. Miller,* 688 F.2d 652 (9th Cir.1982), the United States Court of Appeals for the Ninth Circuit addressed the "Government Private Search Distinction." In *Miller,* a victim of a theft contacted a federal agent and a sheriff and told them he was going to retrieve his stolen property. The federal agent and the sheriff went to the scene, but remained out of sight and took no part in the "victim's" actions to recover his stolen property. The Ninth Circuit affirmed the trial court's denial of Miller's motion to suppress, agreeing that the Fourth Amendment's prohibitions against unreasonable searches had not been violated. The court in *Miller* examined the distinction between a search by a person acting as a private party versus as an agent for the state. The court stated:

"In the proceedings below, Miller moved to suppress the evidence derived from Szombathy's visits to Miller's property. He correctly noted that, although a search or seizure conducted by a private party does not violate the Fourth Amendment, if that individual acts as an instrument or agent of the state in conducting the search, Fourth Amendment interests are implicated. *Coolidge v. New Hampshire,*

403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The district court rejected Miller's contention that Szombathy acted as an instrument of the government when visiting Miller's property. It reasoned that Szombathy's prior contacts with Agent Nelson and Sheriff Boyce were not such that they made him a government agent, and that he therefore acted in a private capacity. We agree.

"Our analysis starts with *United States v. Walther*, 652 F.2d 788 (9th Cir.1981). There we noted that there is no bright line that distinguishes instances of 'government' conduct from instances of 'private' conduct, and that we should refer to certain general principles when analyzing cases in the 'gray area.' *Id.* at 791. We discussed those general principles:

> While a certain degree of governmental participation is necessary before a private citizen is transformed into an agent of the state, *de minimis* or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny. The government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions before we deem the citizen to be an instrument of the state....

*Id.* From our review of earlier cases, we discerned that two critical factors in the 'instrument or agent' analysis are: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends. *Id.* at 791–92."

*Id.* at 656–57 (footnotes omitted). In the case at bar, the Court of Special Appeals relied on *Miller* in its analysis of whether state action occurred:

> "*Miller* is instructive because it discerned from the case law the following test to determine state action: did the police officer (1) instigate, (2) participate, or (3) knowingly acquiesce in the private party's search in conjunction with

an intent by the private party to further the private party's own ends, as opposed to an intent to assist law enforcement."

*Collins*, 138 Md.App. at 309, 771 A.2d at 484.

The test set forth in *Miller* has been applied by several other circuits, the Seventh, Eighth, Ninth, Tenth, and Eleventh.[7] The United States District Court for Maryland, in *Hooper v. Sachs*, 618 F.Supp. 963, 968 (D.Md.1985), has addressed the issue. The District Court stated that, "Courts which have considered the agency question in the context of Fourth Amendment violations focus on two issues: 1) the extent of the involvement of the government, and 2) the purpose or purposes of the private citizen in conducting the search."

### ii.  Our Case

We commence our instant analysis by first considering what overt actions, if any, the police officer took to assist the bail bond persons and the implications of that action.  We then consider whether the evidence supports that the bail bond persons' purpose at the inception, and throughout the search for the principal, was limited solely to the private purposes of the bond persons.[8]

---

**7.**  *See United States v. Feffer*, 831 F.2d 734, 739 (7th Cir.1987) ("Our review of the foregoing cases makes clear that . . . two critical factors in the 'instrument or agent' analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further her own ends."); *United States v. Malbrough*, 922 F.2d 458, 462 (8th Cir.1990); *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir.1994); *United States v. Souza*, 223 F.3d 1197, 1201 (10th Cir.2000); *United States v. Simpson*, 904 F.2d 607, 610 (11th Cir.1990); *United States v. David*, 943 F.Supp. 1403, 1409 (E.D.Va.1996).

**8.**  Supportive of this notion, we note a string of federal and out-of-state case law mentioned by petitioner holding that *"de minimus"* conduct by police cannot ground state action.  *See United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir.1996) (holding no state action for third party search where officer expressed opinion that, while he could not legally open package the bus station manager could); *United States v. Leffall*, 82 F.3d 343, 349 (10th Cir.1996) (no state action for third party search

In the case *sub judice,* the actions of Officer Hook in relation to the bail bond agents and respondent was more akin to non-incidental and impliedly supportive conduct, as opposed to mere standby protection services. In conjunction with the inherent nature of the bail bond process, the extra actions of the officer under the specific circumstances here present, transformed the actions of the bail bond persons into "State action" subjecting the search to Fourth Amendment analysis.

In the particular jurisdiction and police agency here involved, there existed an arrangement for "stand by" service for bail bond persons where the police agency would regularly furnish officers to accompany bail bond agents attempting to "retake" principals. The record does not reflect that this practice only existed in circumstances where the principal was a fugitive.[9]

On the day in question, Officer Hook was contacted by another officer, and directed to a particular location to meet one of the bail bond persons. Upon his arrival at the location, the two bail bond persons were present and informed him that they wanted him to accompany them as they sought to retake a Michael Estep. Estep was described to the officer, but as far as we can discern from the record the officer was not aware of why "retake" was desired. As far as the officer knew no warrant was outstanding for Estep. The bail bond persons had no copies of any warrant in their possession. Officer Hook went with them to the residence where they had

---

where officer examined unsealed outer shipping box); *United States v. David,* 943 F.Supp. 1403, 1410–14 (E.D.Va.1996) (deciding no state action for third party search where the government informed UPS that a package recipient was under investigation and government remained on phone when UPS employee opened package); *Virdin v. State,* 780 A.2d 1024, 1032–33 (Del.2001), *petition for cert. filed* (Dec. 10, 2001).

9. The authority of a bail bond person to retake principals does not always involve a fugitive. Bail bond agents, under some circumstances may be able to "retake" because of an apprehension as to a principal's prospective appearance at a scheduled court appearance or because of a failure of the agent's security, etc.

been informed that Estep might be present. It was not known to be Estep's residence, and in fact, was not.

Upon arriving at the residence, Officer Hook became more than "stand by" security. It was Officer Hook, and not the bail bond persons who knocked on the door. It was Officer Hook, not the bail bond persons, who was immediately at the door when Collins responded to the knock. At that point, any reasonable person would have believed that Officer Hook, and the persons with him, were involved in "State action." When Collins opened the door, it was Officer Hook, not the bail bond persons, who "Asked [Collins] if *we* [the officer and the bail bond persons] could check the residence for a wanted subject...." [10] (Emphasis added.) The record does not reflect that Officer Hook at that time informed Collins that the persons with the officer were not police officers but instead were private citizens, nor does the record reflect that the officer informed Collins that he was not present on State business but was, in effect, merely assisting private persons by "standing by" for security purposes. The officer also did not advise Collins in respect to the bail bond persons' private rights, if any, to force entry into the residence of one other than the person they were seeking to retake. Neither does the record reflect that the bail bond persons advised Collins that they were there on private, not State, business. At this point, a reasonable person would have perceived that "State action" was involved.

Collins responded to the officer's question by denying entry to the apartment, and telling the officer that the person being sought was not in the apartment (Estep was not in the apartment). At that point, the bail bond persons, without, as far as we can discern from the record, informing Collins that they were not "State actors," told Collins that they were going into the apartment in spite of his refusal to consent to their entry. Collins still declined to consent to their entry. At this point, a reasonable person, with a police officer present assist-

---

10. The record does not reflect whether he was wanted by anyone other than the bail bond persons.

ing the speaker, would likely believe that "state agents" were informing Collins they were going to force entry.

One of the bail bond persons then asked Collins if anyone else was within the premises. Collins then called into the apartment and another subject came out. It was not Estep. That person then told one of the bail bond persons she could enter the apartment to look for Estep. Whether Collins, at this time, agreed to her entry is not clear from the record. The record does not reflect that, even at this point, the officer informed the occupants of the apartment that it was private, not "State action" that was in process.

Collins, Officer Hook, and apparently the other bail bond person remained outside the opened door as the other occupant and a bail bond person went into the apartment. At this point, the officer testified that he smelled the odor of burnt marijuana. According to the officer, the odor became stronger the longer the door stayed open. Still, at this time the officer took no action and did not call for backup.

When the bail bond person came out of the apartment, she informed Officer Hook, in Collins's presence, that she had seen approximately fifteen marijuana plants of various sizes growing inside the apartment. At this point, Collins reentered the apartment telling his dog to watch the officer and the two bail bond persons. Collins then closed the door leaving the officer and his companions on the porch with the dog. Even at this late time in the process, Collins was not informed that what had occurred was private action.

At this point, while watched by the dog, Officer Hook radioed for other officers to join him, the bail bond persons, and the dog. After two other officers arrived, one of the bail bond persons informed Officer Hook that she was observing Collins running down an alley with a black plastic bag over his shoulder. At this point, the bail bond persons had utilized the services of the officer to knock on the door, and to inform Collins that they desired to enter to search for a "wanted" person; yet neither the officer nor the bail bond persons had informed Collins of the private nature of the request and the

officer included the bail bond person in his generic use of the word "we" when seeking entry. A bail bond person had then entered and when she exited had informed the officer of the collateral things she had observed in the apartment. At that point, the officer claimed to have smelled marijuana while standing near the door that had been opened upon his knocking. The bail bond persons had also informed the officer that Collins was running down the alley.

Upon receiving this last information, Officer Hook, through his own observations, saw Collins running down the alley. The group on the porch then proceeded down the alley. The group included the dog, who expanded the services he was performing for his master beyond merely watching the officers, to impeding their progress down the alley. We are not informed of the physical characteristics of the dog. We make the inference that, regardless of his size and disposition, he (or, perhaps, she) was aiding and assisting its master, as is the wont of "man's best friend." [11]

Ultimately, the police officers convinced Collins to relieve the dog of his most recently conferred duties. Collins then tied the dog's leash to the bumper of a car, and Collins was arrested. The contraband in the bag formed the basis for the charges against him.

It is clear to this Court, as it was to the Court of Special Appeals, that the actions of the officer and the bail

---

11. Justice Gilbert of the Supreme Court of Georgia in the case of *Montgomery v. Maryland Casualty Company,* 169 Ga. 746, 748–50, 151 S.E. 363, 364–65 (1930) opined, in part:

"From the dawn of primal history the dog has loomed large in the art and literature of the world, including judicial literature. So it doubtless will be until the 'crack of doom.' In metal and in stone his noble image has been perpetuated, but the dog's chief monument is in the heart of his friend, 'man.' ... [T]he dog has ever been a faithful companion and helper of man....

. . .

"Some three thousand years before Christ Socrates wrote: 'When I see some men, I love my dog the more.'"

Judge Gilbert notes that considering that Socrates supposedly imbibed a mortal dose of hemlock in 399 B.C., the reference to three thousand years before Christ might be somewhat imprecise.

bond persons in the present case were, from the beginning and almost to the point of arrest, so intertwined with each other, that the entire action from its inception took on the characteristics of "State action."

In sum, what occurred was, under the circumstances of this case "State action" and should have undergone a complete Fourth Amendment analysis, including a determination as to whether there was a valid consent to search. We need not, in this opinion, go into the case law pertaining to Fourth Amendment exceptions or if consent by "Jimmy," the second person in the apartment, constituted a valid exception. The question presented to this Court on appeal covers only the bail bond agents and their role as State actors. As held by the Court of Special Appeals, it remains up to the Circuit Court on remand to determine the validity of the consent.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**